Filed 5/23/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TIMOTHY CRAINE,<br><br>    Defendant and Appellant. | F074622<br><br>(Super. Ct. No. DF012338A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Robert S. Tafoya, Judge.

Caitlin M. Plummer, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II., and III. of the Discussion.

Timothy Craine was convicted by jury of indecent exposure. It was his sixth such conviction, thus making the offense a felony. He was sentenced to seven years in prison.

Craine represented himself at trial. On appeal, he contends the trial court breached a sua sponte duty to determine his mental competence under Penal Code section 1368 (all further statutory references are to this code). In a related claim, he argues the trial court should have assessed his competence to proceed in propria persona under a "heightened standard" as compared to the one used to determine a defendant's competence to stand trial. He further alleges sentencing error based on the trial court's failure to state its reasons for imposing the maximum prison term.

In supplemental briefing, Craine argues for retroactive application of section 1001.36, which authorizes "pretrial diversion" in certain cases involving mentally disordered offenders. In the published portion of our opinion, we conclude the Legislature did not intend for section 1001.36 to apply retroactively to defendants whose cases have already progressed beyond the stage of trial, adjudication of guilt, and sentencing. The judgment will be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

In early 2016, Craine was residing in a special housing unit at the North Kern State Prison. He had recently been classified as a mentally disordered offender (MDO) (see § 2960 et seq.) and placed on a "suicide watch," which entailed continuous monitoring by a certified nursing assistant (CNA). On or about January 13, 2016, Craine stripped naked in front of a female CNA and began masturbating. A second CNA witnessed this behavior, as did a correctional officer who intervened.

Craine was subsequently transferred to a Department of State Hospitals facility in Atascadero. He was later charged with one count of felonious indecent exposure (§ 314, subd. (1)). For enhancement purposes, he was alleged to have served five prior prison terms (§ 667.5, subd. (b)).

2.

The record does not identify the nature of Craine's mental disorder, but he remained in Atascadero until being transferred to the Kern County Jail in connection with this case. On April 7, 2016, Craine appeared at a preliminary hearing with appointed counsel. Eleven days later, he was represented by appointed counsel during another court proceeding. In June 2016, shortly before trial, Craine successfully moved to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). He acknowledged his constitutional rights and unequivocally waived the right to counsel, both orally and in writing.[1]

A three-day trial commenced on June 15, 2016. Craine presented arguments on motions in limine, participated in the jury selection process, gave opening and closing statements, and cross-examined two of the three witnesses who testified. He disputed a prior prison term allegation concerning a conviction for second degree burglary, and one such allegation was dismissed at the People's request.

The jury returned a guilty verdict and found the enhancement allegations to be true. The trial court imposed the upper term of three years and added four consecutive one-year enhancements for the prison priors. A handwritten notice of appeal, which was served upon the district attorney's office and belatedly received by the trial court, was deemed to have been timely filed.

## DISCUSSION

### I.  The *Faretta* Motion Was Properly Granted[*]

The constitutional right to due process prohibits the trial of a mentally incompetent criminal defendant. (*In re R.V.* (2015) 61 Cal.4th 181, 188.) Under federal law, the test for competence is whether the defendant "'has sufficient present ability to consult with

---

[1]  The record contains a preprinted *Faretta* form, which Craine filled out and signed. The form is file stamped June 7, 2016, but it was purportedly executed on June 9, 2016. Craine's motion was orally made and ruled upon on the latter date.

[*]  See footnote, *ante*, page 1.

3.

his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" (*Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*).)  In California, section 1367 codifies a nearly identical standard.  "A defendant is mentally incompetent … if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."  (*Id.*, subd. (a).)

In *Faretta*, the United States Supreme Court recognized a constitutional right to self-representation.  (*Faretta*, *supra*, 422 U.S. at p. 832.)  A *Faretta* motion must be granted if the defendant's waiver of the right to counsel is timely, competent, knowing, and voluntary.  (*Id.* at p. 835; *Godinez v. Moran* (1993) 509 U.S. 389, 399–400 (*Godinez*).)  "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings.  [Citation.]  The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced."  (*Godinez*, *supra*, at p. 401, fn. 12.)

As held in *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*), state courts may, but need not, deny self-representation to defendants who are competent to stand trial under the *Dusky* standard but nevertheless lack the mental health or capacity to forgo the assistance of counsel.  (*Edwards*, *supra*, at p. 174; *People v. Johnson* (2012) 53 Cal.4th 519, 523 (*Johnson*).)  The *Edwards* opinion refers to such individuals as "gray-area defendants."  (*Edwards*, *supra*, at pp. 172–174.)  In *Johnson,* the California Supreme Court concluded trial judges "should have discretion to deny self-representation to gray-area defendants."  (*Johnson*, *supra*, at p. 528.)  However, "[b]ecause the *Edwards* rule is permissive, not mandatory, … *Edwards* 'does not support a claim of federal constitutional error in a case like the present one, in which [the] defendant's request to

represent himself was granted.'" (*Id.* at p. 527, quoting *People v. Taylor* (2009) 47 Cal.4th 850, 878.)

The *Johnson* opinion goes on to discuss "the standard for trial courts to employ when deciding whether to deny self-representation under *Edwards* .…" (*Johnson*, *supra*, 53 Cal.4th at p. 529.) "*Edwards* described competence to represent oneself at trial as the ability 'to carry out the basic tasks needed to present [one's] own defense without the help of counsel.' (*Edwards*, *supra*, 554 U.S. at pp. 175–176.) It also said the states may deny self-representation to those competent to stand trial but who 'suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.'" (*Johnson*, *supra*, at p. 530.) The California Supreme Court declined to adopt a more specific standard. (*Ibid.*)

Craine alleges the trial court erred by granting his *Faretta* motion without first ordering an assessment of his mental competence. In making this argument, he asks us to formulate a new rule under which trial courts "must apply the heightened *Edwards* standard whenever a defendant seeks to represent himself." We decline the request. On the question of error, we are constrained by case law.

A defendant is presumed to be competent. (§ 1369, subd. (f); *People v. Medina* (1990) 51 Cal.3d 870, 881.) "A trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so *only if it is considering denying self-representation due to doubts about the defendant's mental competence*." (*Johnson*, *supra*, 53 Cal.4th at p. 530, italics added.) Craine acknowledges the quoted language and essentially argues it should be disregarded. Elsewhere in his briefing, he suggests the high court did not mean what it said. We are unpersuaded, especially considering the same point was reiterated in *People v. Espinoza* (2016) 1 Cal.5th 61, 80 and *People v. Mickel* (2016) 2 Cal.5th 181, 208 (*Mickel*).

Craine's *Faretta* motion was heard and ruled upon by the Honorable Marcos A. Camacho, whose role in the case was otherwise limited to presiding over the preliminary

hearing. Appointed counsel informed Judge Camacho of Craine's desire to proceed in propria persona during a trial confirmation hearing. Counsel did not voice any concerns regarding Craine's competence, and Craine's behavior in front of Judge Camacho demonstrated full cognizance of his actions and the nature of the proceedings.

Craine referenced "*Faretta*" while making his request to "waive my right to have an attorney counsel me." He later provided an articulate synopsis of his educational background and work history, expressed familiarity with the concept of discovery, and acknowledged the disadvantages of self-representation. He also asked for, and received, an explanation of the charges against him and his maximum sentencing exposure. Judge Camacho expressed no doubts about Craine's competence to stand trial. On the record before us, we cannot say the trial court erred by granting the *Faretta* motion without further inquiry into Craine's mental health.

## II.     Section 1368 Proceedings Were Not Required*

"'Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' [Citation.] State constitutional authority is to the same effect." (*People v. Lightsey* (2012) 54 Cal.4th 668, 690–691.) Accordingly, Craine alleges the trial court had a sua sponte duty to order an evaluation of his mental competence. The claim is governed by section 1368.

Under section 1368, if "a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of [defense counsel] whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or [defense counsel] or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit

---

*        See footnote, *ante*, page 1.

6.

counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time." (*Id*., subd. (a).) If counsel or the trial court believe the defendant is or may be mentally incompetent, a hearing to determine the question of competence should be conducted pursuant to sections 1368.1 and 1369. (§ 1368, subd. (b).)

Although section 1368 is phrased in terms of whether a doubt exists "in the mind of the judge," case law holds that substantial evidence of incompetence triggers the right to a competency hearing as a matter of law. (*People v. Stankewitz* (1982) 32 Cal.3d 80, 91–92; *People v. Pennington* (1967) 66 Cal.2d 508, 518.) The sua sponte duty to conduct a competency hearing may arise at any time prior to judgment. (*People v. Rogers* (2006) 39 Cal.4th 826, 847 (*Rogers*).) If evidence of the defendant's incompetence is less than substantial (and the court has not expressed a doubt as to his competence), the decision to conduct such a hearing is a matter of discretion. (*Pennington*, *supra*, at p. 518.) "A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*Rogers*, *supra*, at p. 847.)

Substantial evidence of incompetence is evidence "that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial." (*Rogers*, *supra*, 39 Cal.4th at p. 847.) Such evidence may come from any source, and the trial court "must consider all of the relevant circumstances." (*People v. Howard* (1992) 1 Cal.4th 1132, 1164.) "If a defendant presents merely 'a litany of facts, none of which actually related to his competence … to understand the nature of [the] proceeding[s] …,' the evidence will be inadequate to support holding a competency hearing. [Citation.] In other words, a defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of [his competence to stand trial]." (*People v. Ramos* (2004) 34 Cal.4th 494, 508.)

7.

The threshold for competence is low. "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel." (*Godinez, supra*, 509 U.S. at p. 402.) Even under the heightened *Edwards* standard, a self-represented defendant is competent if he or she is capable of performing "basic trial tasks," e.g., making motions, presenting arguments, participating in voir dire, questioning witnesses, and addressing the judge and jury. (*Mickel*, *supra*, 2 Cal.5th at pp. 208–209.)

Craine emphasizes his MDO classification, the fact he was on a suicide watch when the charged offense occurred, and his transfer to a Department of State Hospitals facility a few months before trial. These are relevant facts, but they are not dispositive. "[E]ven a history of serious mental illness does not necessarily constitute substantial evidence of incompetence that would require a court to declare a doubt concerning a defendant's competence and to conduct a hearing on that issue." (*People v. Blair* (2005) 36 Cal.4th 686, 714.) The same is true of suicidal ideations. (*Rogers*, *supra*, 39 Cal.4th at p. 848.) "By definition, every mentally disordered offender has previously been deemed competent to stand trial, and the premise of the MDO statute is that severe mental disorders are 'treatable.'" (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1129.) "The potentially transitory and treatable nature of mental illness and the potentially limited areas of functioning impaired by such illness preclude any categorical inference that an MDO defendant [is incompetent]." (*Ibid*. [discussing competency to waive the right to a jury trial in a civil commitment proceeding].)

Craine argues he "often had substantial difficulty with communication" during trial, "appeared confused about which matters were being discussed, failed to present a coherent defense, and engaged in several rants that were both legally irrelevant and otherwise largely incoherent." We address each contention in turn.

What Craine describes as "difficulty with communication" primarily refers to his tendency to use words and expressions that were beyond the scope of his vocabulary. For

example, he often misused the term "in lieu" and frequently, yet ineffectively, attempted to incorporate legalese into his statements.

Craine also downplays his performance of trial tasks such as lodging objections and cross-examining witnesses. His objections were made in proper form, e.g., "Objection, your Honor, foundation," "Objection, your Honor, this is speculative," "Objection, your Honor, leading the witness," "Objection, your Honor, assuming facts not in evidence." His cross-examinations addressed topics such as the witnesses' vantage points and ability to see the alleged crime, as well as the date and location of the incident. Craine was very much engaged in the process, at one point mocking a witness for asking him to "refrain" a question: he said, "I won't refrain that question, but I'll rephrase it."

Despite claiming to have "appeared confused" during trial, Craine's opening brief cites only one remark he made during motions in limine: "If I pick up any of these papers, are these discovery that can be eliminated through a motion process?" He then pivots to a discussion about his ignorance of various legal concepts and failure to present "a coherent theory of the case to the jury, other than generalities that were embedded in otherwise improper arguments." In his reply, Craine notes his confusion regarding "the distinction between a document being used to refresh a witness's recollection and one being admitted in evidence." These arguments concern the inapposite question of his ability to effectively represent himself.

"The focus of the inquiry is the defendant's mental capacity to understand the nature and purpose of the proceedings against him or her. [Citations.] The defendant's "'technical legal knowledge'" is irrelevant." (*People v. Blair*, *supra*, 36 Cal.4th at p. 711.) For example, in *People v. Woodruff* (2018) 5 Cal.5th 697, neither the defendant's low IQ, nor his confusion about certain legal concepts, "nor his inability to understand the court's discussion of case law" amounted to substantial evidence of incompetence. (*Id*. at pp. 722–723.) Higher courts "have accepted that the cost of recognizing a criminal defendant's right to self-representation may result "'in detriment

9.

to the defendant, if not outright unfairness."'" (*Mickel*, *supra*, 2 Cal.5th at p. 206; see *Godinez*, *supra*, 509 U.S. at p. 399 [rejecting the argument that a self-represented defendant "'"must have greater powers of comprehension, judgment, and reason than would be necessary to stand trial with the aid of an attorney."'"].)

Regardless of his ineptitude, there is no question Craine understood he was being prosecuted for indecent exposure and would be sentenced to prison if convicted. On the first day of trial, he rejected a four-year plea deal. In acknowledging the terms of the offer, he correctly observed that the proposed fixed term translated to "two years with half time." During opening statements, he noted a witness claimed to have "seen me gratifying and exposing my genitalia" and concluded his remarks by saying, "there is no proof beyond a reasonable doubt that these things happened."

In closing argument, Craine said, "They tried to illicitly make me sound like I was gratifying myself in a public place. This is not true.… [¶] … [¶] There was no willful exposure." These statements are significant because section 314, subdivision (1), requires that a person "willfully and lewdly" expose himself "in any public place, or in any place where there are present other persons to be offended or annoyed thereby." In other words, Craine showed a general understanding of the charge and the prosecution's evidentiary burden.

After the jury returned its guilty verdict, Craine asked the trial court for "grace" in light of the expense his confinement would impose upon the taxpayers of Kern County. The argument quickly devolved into nonsense: "That's $1,500 in revenue for every $5 that it's paid for every person that is an inmate regarding of gender, let alone all the things that are going to happen when there's going to be a huge earthquake.… It's going to be bad. And I'm trying to help health and safety. [¶] And I'm trying to ask you[—]like the more that this goes [on] with all that's being paid in for, it's costing me $50 that I can't even make five remarks to tell you that I can't get this off the record." Later, as

10.

Craine describes in his briefing, he launched into "another bizarre and untimely request for a lenient sentenc[e]."

Craine's misguided and sometimes unintelligible remarks do not establish a reasonable doubt about his competence to stand trial. During and after the bizarre comments, he presented arguments regarding his anticipated sentence and the admission of evidence concerning his prior prison terms. "Even supposing [the] defendant is correct that the various examples of his rambling, marginally relevant speeches cited in his briefing may constitute evidence of some form of mental illness, the record simply does not show that he lacked an understanding of the nature of the proceedings or the ability to assist in his defense." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1064.) As stated in *In re Sims* (2018) 27 Cal.App.5th 195, "evidence of mental illness alone is insufficient to raise a doubt as to competency. [Citation.] Bizarre statements or actions, taken in isolation, do not require a court to hold a competency hearing." (*Id*. at p. 209.)

In *People v. Halvorsen* (2007) 42 Cal.4th 379, the California Supreme Court determined a trial court did not err by failing to conduct proceedings under section 1368 even though (1) a psychiatrist had testified the defendant was psychotic and (2) the defendant's trial testimony was "'filled with tangential responses to the questions of counsel and strange, irrelevant statements, often marked by a seemingly psychosis-induced preoccupation with a newly embraced religion and an obsession with his own and society's unworthiness.'" (*People v. Halvorsen*, *supra*, at p. 402.) In *People v. Welch* (1999) 20 Cal.4th 701, 742, substantial evidence was lacking despite the defendant's disruptive behavior, history of making "nonsensical motions," and stated belief that the trial court, prosecutor, and his own counsel were "'acting in collusion with each other.'" (*Id*. at pp. 730–731 & fn. 3.) "[T]he trial court *could have* ordered a hearing on competence to stand trial," but it was not required to do so as a matter of law. (*Id*. at p. 742.)

11.

Based on the foregoing analysis, we conclude the evidence of Craine's alleged incompetence was less than substantial. Therefore, the trial court did not have a legal duty to conduct the proceedings described in section 1368. Its failure to declare a doubt regarding Craine's competence to stand trial was a matter of discretion, and no abuse of discretion has been shown.

## III. The Claim of Sentencing Error Was Forfeited[*]

The trial court did not specify its reasons for imposing the upper term for the indecent exposure conviction. At most, it attempted to incorporate by reference the aggravating circumstances cited in the probation report, i.e., Craine's five prior convictions for the same offense and history of unsatisfactory performance on probation and parole. Craine alleges error and requests a new sentencing hearing. (§ 1170, subd. (b); see *People v. Fernandez* (1990) 226 Cal.App.3d 669, 679 ["merely incorporating the probation report by reference violates the spirit of the sentencing laws and fails to properly explain the basis for any sentencing choice"].)

Claims of discretionary sentencing error, including those based on a trial court "merely incorporating by reference the aggravating and mitigating circumstances in the probation report," are subject to forfeiture. (*People v. Scott* (2015) 61 Cal.4th 363, 406.) "'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial.'" (*Ibid.*) Craine made no objections at the time of sentencing.

The forfeiture rule does not apply "if the trial court fails to give the parties any meaningful opportunity to object" to the sentence. (*People v. Gonzalez* (2003) 31 Cal.4th 745, 752 (*Gonzalez*).) For example, in *People v. Superior Court* (*Dorsey*) (1996) 50 Cal.App.4th 1216, the trial court placed the defendant on probation and "immediately

---

[*] See footnote, *ante*, page 1.

declared a recess without hearing from either party." (*Gonzalez*, *supra*, at p. 752, citing *Dorsey*, *supra*, at p. 1224.)  The defendant was presumptively ineligible for probation, but "the prosecutor had no opportunity, meaningful or otherwise, to object." (*Dorsey*, *supra*, at p. 1224.)  Therefore, an appeal of the sentence was permissible despite the lack of any objections.  (*Ibid.*)

Here, the trial court announced its intention to "follow the recommendation of probation."  The sentence was pronounced immediately thereafter, with the judge pausing to confer with the prosecutor about whether the upper term was three or four years. Before concluding the hearing, the trial court said, "Is there anything else that we need to take up at this time?  Hearing none .…"  The People construe these statements as providing a meaningful opportunity for the parties to object.  Craine disagrees.

Craine submits that a meaningful opportunity to object must precede the pronouncement of sentence.  He relies on the following quote from *Gonzalez*, *supra*, 31 Cal.4th at page 752:  "The parties are given an adequate opportunity to seek such clarifications or changes if, at *any time* during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties before the actual sentencing."  Craine's argument, while cogent, is difficult to reconcile with *People v. Boyce* (2014) 59 Cal.4th 672 (*Boyce*), which was decided nearly 11 years after *Gonzalez*.  In *Boyce*, the California Supreme Court applied the forfeiture rule under circumstances wherein the trial court, after the pronouncement of sentence, had (1) "entertained a prosecution request for clarification about the certification of the record," (2) "allowed defense counsel to enumerate his objections to the probation report," and (3) "adjourned after asking counsel if there was anything else to discuss." (*Boyce*, *supra*, at p. 731.)

In *People v. Sperling* (2017) 12 Cal.App.5th 1094, 1101–1102 (*Sperling*), Division Six of the Second District Court of Appeal interpreted *Boyce* to mean the requisite opportunity to object can occur at any time during the sentencing hearing.  The

issue arose as follows. "After pronouncing sentence, the court asked, 'Is there any other record either of you would like me to make?' The prosecutor replied[,] 'No.' [Defense] counsel remained silent." (*Sperling*, *supra*, at pp. 1101–1102.) Consequently, the defendant was found to have "forfeited his sentencing claims because he did not object at the time of sentencing." (*Id.* at p. 1100.)

In his reply, Craine argues that "*Sperling* appears to be in direct conflict with the language of *Gonzalez*." However, he does not discuss or even cite the *Boyce* opinion. We are not persuaded by his criticism of *Sperling*. In light of *Boyce* and *Sperling*, we conclude the claim of sentencing error was forfeited.

## IV.    Section 1001.36 Does Not Apply Retroactively To Convicted Defendants

Section 1001.36 was enacted during the pendency of this appeal. It authorizes, in lieu of criminal prosecution, the placement of certain alleged offenders into mental health treatment programs. The statute expressly contemplates a "pretrial diversion" procedure (*id.*, subd. (a)), but Craine contends he is still a "potential candidate for diversion," assuming the law applies retroactively. The issue of retroactivity is currently under review by the California Supreme Court. (See *People v. Frahs* (2018) 27 Cal.App.5th 784, review granted Dec. 27, 2018, S252220 (*Frahs*).)

We conclude the text of section 1001.36 and its legislative history contraindicate a retroactive intent with regard to defendants, like Craine, who have already been found guilty of the crimes for which they were charged. The statute potentially mitigates punishment for a specific class of persons, i.e., mentally disordered alleged offenders whose charges have not yet been adjudicated (*id.*, subds. (a), (c)), and Craine is not a member of the class. The primary legislative goal of diverting mentally ill defendants from the criminal justice system through preadjudicative intervention programs cannot be achieved once the defendant has been tried, adjudged guilty, and sentenced.

Secondary goals of judicial economy and fiscal savings would actually be thwarted by attempting to apply the statute to defendants who have begun serving their

sentences. In many instances, such individuals will have been released from confinement by the time their cases are remanded to determine their fitness for any supposed diversionary relief. Furthermore, although section 1001.36 provides for the dismissal of charges and expungement of a defendant's record of arrest, there is no mention of similar relief for a record of conviction. As we will discuss, there are distinctions between a preconviction and postconviction dismissal of charges, and the Legislature's failure to address those differences also weighs against any inference of retroactive intent.

### A. Statutory Overview

California has an expanding number of diversion programs, "which generally authorize trial courts to divert eligible persons charged with qualifying offenses from the normal criminal process into treatment and rehabilitation." (*Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 707.) "Although it is unclear when California courts first began employing pretrial diversion, the first California statute authorizing such diversion was enacted in 1972." (*People v. Weatherill* (1989) 215 Cal.App.3d 1569, 1575.) Incidentally, of all the diversion statutes enacted in the past several decades, it appears section 1001.36 is the first to generate controversy over the question of retroactivity.[2]

Section 1001.36 created a diversion program for defendants who suffer from medically recognized mental disorders, "including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder .…"
(§ 1001.36, subd. (b)(1)(A).) Enacted as part of Assembly Bill No. 1810 (2017–2018 Reg. Sess.) (Assembly Bill 1810), which was a budget trailer bill, the law took effect on June 27, 2018. (Stats. 2018, ch. 34, §§ 24, 37). Three months later, the statute was amended to prohibit its use in cases involving murder, voluntary manslaughter, rape and other sex crimes, the use of a weapon of mass destruction, and any offense "for which a

---

[2] The closest case we have found is *People v. Perez* (1998) 68 Cal.App.4th 346, which held that a 1997 amendment to an existing drug diversion statute did not apply retroactively. (*Id.* at p. 349.)

person, if convicted, would be required to register pursuant to Section 290, except for a violation of Section 314[, i.e., indecent exposure]." (§ 1001.36, subd. (b)(2)(A)–(H); Stats. 2018, ch. 1005, § 1.)

Subject to numerous caveats and restrictions, trial courts may now "grant pretrial diversion" when a mentally disordered individual is charged with a misdemeanor or felony offense (other than those previously mentioned). (§ 1001.36, subd. (a).) The defendant must first produce evidence of a mental disorder, which requires "a recent diagnosis by a qualified mental health expert." (*Id*., subd. (b)(1)(A).) Among other requirements, the trial court must be "satisfied that the defendant's mental disorder was a significant factor in the commission of the charged offense," and a mental health expert must also conclude "the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (*Id*., subd. (b)(1)(B), (C).)

The purpose of the new law "is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35.)

In this context, diversion is generally understood to mean "the suspension of criminal proceedings for a prescribed period of time with certain conditions." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017-2018 Reg. Sess.) Jan. 9, 2018, p. 6; see *People v. Ormiston* (2003) 105 Cal.App.4th 676, 690 [describing the legal effect of diversion in drug cases (§ 1000 et seq.)].) However, when the Legislature uses the phrase "pretrial diversion" in a statute, the term is often precisely defined. (See, e.g., §§ 1001.1, 1001.70, subd. (b), 1001.80, subd. (k)(1).) As used in section 1001.36, pretrial diversion means "the postponement of prosecution, either temporarily or permanently, at any point

in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment, subject to [additional restrictions.]" (*Id*., subd. (c).)

If a defendant meets the eligibility requirements of section 1001.36, the trial court may order pretrial diversion into an approved treatment program for a maximum period of two years. (*Id*., subd. (c)(1), (3).) If the defendant commits additional crimes or otherwise performs unsatisfactorily in the diversion program, criminal proceedings may be reinstated. (*Id.*, subd. (d).) "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (*Id*., subd. (e).) The statute further provides for expungement of the "record of the arrest," with specified limitations. (See *id*., subds. (e) ["if the court dismisses the charges, the arrest upon which the diversion was based shall be deemed never to have occurred"], (f)–(g).)

## B.    Applicable Law Re:  Retroactivity

Case law instructs that "a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287.) Section 3 codifies an ostensibly stronger presumption:  "No part of [the Penal Code] is retroactive, unless expressly so declared." However, in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the California Supreme Court determined that an amendment to a particular criminal statute was intended to apply retroactively despite the Legislature's failure to expressly declare such an intent. The high court's rationale in reaching its conclusion has come to be known as the "*Estrada* rule."

The *Estrada* case involved a habeas corpus petitioner who had pleaded guilty to escape as defined in a former version of section 4530. (*Estrada*, *supra*, 63 Cal.2d at p. 743.) At the time of the offense, his crime "was punishable by at least a one-year

17.

period of imprisonment." (*Ibid*.) Subsequent to his capture but prior to his conviction and sentencing, the Penal Code was amended to reduce the applicable mandatory term of incarceration and to require no minimum period before parole consideration. (*Id*. at pp. 743–744.)

This is the holding of *Estrada*: "When the Legislature amends a statute so as to lessen the punishment [for a crime,] it has obviously expressly determined that its former penalty was too severe …. [Therefore,] [i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Estrada*, *supra*, 63 Cal.2d at p. 745.)

The *Estrada* opinion also states, "[W]here the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed." (*Estrada*, *supra*, 63 Cal.2d at p. 748.) The California Supreme Court has since clarified "that the absence of an express savings clause does not necessarily resolve the question whether a lawmaking body intended a statute reducing punishment to apply retrospectively." (*People v. DeHoyos* (2018) 4 Cal.5th 594, 601; accord, *People v. Conley* (2016) 63 Cal.4th 646, 656.) "The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief *or other clear intention concerning any retroactive effect*, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible ….'" (*People v. Buycks* (2018) 5 Cal.5th 857, 881, italics added, quoting *Conley*, *supra*, at p. 657.) Therefore, if the statute in question contains no express savings clause, reviewing courts "must look for any other indications of legislative intent." (*People v. Nasalga* (1996) 12 Cal.4th 784, 794.)

In *People v. Brown* (2012) 54 Cal.4th 314, the high court emphasized "the limited role *Estrada* properly plays in our jurisprudence of prospective versus retrospective operation." (*Id.* at p. 324.) It explained, "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Ibid.*) More recently, in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*), "the same inference of retroactivity" was held to apply to a statutory amendment that "ameliorated the possible punishment for a class of persons[.]" (*Id.* at p. 308.)

The issue in *Lara* arose from the enactment of the Public Safety and Rehabilitation Act of 2016 (Proposition 57), which included amendments to Welfare and Institutions Code section 707. In particular, Proposition 57 eliminated a provision that gave district attorneys unilateral authority to prosecute juveniles as adults in courts of criminal jurisdiction for specified crimes. Under the amended statute, "'[c]ertain categories of minors … can still be tried in criminal court, but only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated. [Citation.]'"[3] (*Lara, supra*, 4 Cal.5th at p. 305, quoting *People v. Vela* (2017) 11 Cal.App.5th 68, 72, review granted July 12, 2017, S242298, & cause transferred Feb. 28, 2018 (*Vela*).)

The question presented was "whether [the] requirement of a transfer hearing before a juvenile can be tried as an adult applie[d] to [the] defendant even though he had already been charged in adult court before Proposition 57 took effect." (*Lara, supra*, 4

---

[3] This is also known as a "fitness" hearing, as the judge must determine "the minor's fitness for treatment under the juvenile court law" as opposed to within the criminal justice system. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548.)

Cal.5th at p. 306.)  The court noted *Estrada* was "not directly on point" because the change in law "did not ameliorate the punishment, or possible punishment, for a particular crime; rather, it ameliorated the possible punishment for a class of persons, namely juveniles." (*Lara*, *supra*, at pp. 303, 308.)  Nevertheless, the same rationale was held applicable in light of "'the possible ameliorating benefits of Proposition 57.'" (*Id.* at p. 311, quoting *Vela*, *supra*, 11 Cal.App.5th at p. 81.)  "The possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment."[4] (*Lara*, *supra*, at p. 303.)

To summarize, *Lara* holds "*Estrada*'s inference of retroactivity" may arise outside the context of legislation that reduces the punishment for a particular crime.  (*Lara*, *supra*, 4 Cal.5th at p. 303.)  The *Estrada* rule is implicated "even if the new legislation merely 'ameliorate[s] the possible punishment for a class of persons.'" (*People v. Buycks*, *supra*, 5 Cal.5th at p. 883, fn. 8, citing & quoting *Lara*, *supra*, at p. 308, italics omitted.)  However, a statute's potentially ameliorative benefits are not alone dispositive of the issue.  (*Lara*, *supra*, at pp. 307–309 & fn. 5.)  Proposition 57 was held to apply retroactively because it "reduces the possible punishment for a class of persons," which permits the inference of retrospective operation, *and* because "nothing in Proposition 57's text or ballot materials rebuts this inference." (*Lara*, *supra*, at pp. 303–304.)

### C.    Analysis

In *Frahs*, Division Three of the Fourth District Court of Appeal observed that "for a defendant with a diagnosed mental disorder, it is unquestionably an 'ameliorating

---

**4**    Juveniles can only be charged as adults for certain crimes, most of which carry severe penalties.  (See Welf. & Inst. Code, § 707, subds. (a), (b)(1)–(20).)  Therefore, juvenile offenders who are prosecuted in criminal court typically face lengthy prison sentences.  In contrast, the harshest punishment under juvenile court law is commitment to the Division of Juvenile Justice (DJJ), and a minor committed to DJJ "'must generally be discharged no later than 23 years of age. ([Welf. & Inst. Code,] § 607, subd. (f).)'" (*Lara*, *supra*, 4 Cal.5th at pp. 306–307, quoting *Vela*, *supra*, 11 Cal.App.5th at pp. 73–74.)

benefit' to have the opportunity for diversion—and ultimately a possible dismissal—under section 1001.36." (*Frahs*, *supra*, 27 Cal.App.5th at p. 791 (review granted).)  We agree the statute confers a potentially ameliorative benefit to a specified class of persons. The question, however, is whether the class includes defendants who have already been found guilty of the crimes for which they were charged.  We believe the answer lies in how the Legislature chose to define the benefit itself, i.e., pretrial diversion.

As discussed, "'pretrial diversion' means the *postponement of prosecution*, either temporarily or permanently, at any point in the judicial process *from the point at which the accused is charged until adjudication ….*"  (§ 1001.36, subd. (c), italics added.)  We agree with respondent's position that "adjudication," which is an undefined term, is shorthand for the adjudication of guilt or acquittal.  (See *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [statutory language is given its "plain and commonsense meaning … in the context of the statutory framework as a whole"]; see also *In re Harris* (1989) 49 Cal.3d 131, 135 ["[T]here is 'no distinction between an adjudication of guilt based on a plea of guilt and that predicated on a trial on the merits.'"]; Black's Law Dict. (10th ed. 2014) p. 50, col. 1 [defining "adjudication"].)  At most, "adjudication" could be synonymous with the rendition or pronouncement of judgment, which occurs at the time of sentencing.  (§§ 1191, 1202; *People v. Flores* (1974) 12 Cal.3d 85, 93, fn. 6; *People v. Thomas* (1959) 52 Cal.2d 521, 529, fn. 3.)  Beyond that point, the trial court ordinarily ceases to have jurisdiction over the matter.  (See *People v. Karaman* (1992) 4 Cal.4th 335, 344 ["Where the trial court relinquishes custody of a defendant, it also loses jurisdiction over that defendant."]; *In re White* (1969) 1 Cal.3d 207, 212 ["When the trial court suspends imposition of sentence and grants probation, no judgment is entered until such time as the probation is revoked and the defendant is sentenced."].)

The *Frahs* opinion concedes the limits of the term "adjudication," recognizing the appellant had "technically been 'adjudicated' in the trial court."  (*Frahs*, *supra*, 27

21.

Cal.App.5th at p. 791 (review granted).)  However, *Frahs* concludes this language is not probative of the Legislature's intent because "[t]he fact that mental health diversion is available only up until the time that a defendant's case is 'adjudicated' is simply how this particular diversion program is ordinarily designed to operate."  (*Ibid*.)  We do not agree with this reasoning.  First, "[t]he purpose of those programs is precisely to *avoid* the necessity of a trial."  (*Gresher v. Anderson* (2005) 127 Cal.App.4th 88, 111.)  Second, the canons of statutory interpretation require scrutiny of the relevant text, "giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose.  A construction making some words surplusage is to be avoided."  (*Dyna-Med, Inc. v. Fair Employment & Housing Com*. (1987) 43 Cal.3d 1379, 1386–1387.)

The other key definitional phrase is "the postponement of prosecution." (§ 1001.36, subd. (c).)  As explained in *People v. Tideman* (1962) 57 Cal.2d 574, prosecution is synonymous with "criminal action," and it means "'[t]he proceeding by which a party charged with a public offense is accused and brought to trial and punishment.'"  (*Id*. at p. 579, quoting § 683, italics omitted; see § 685 ["The party prosecuted in a criminal action is [known] as the defendant."].)  A prosecution "commences when the indictment or information is filed in the superior court and normally continues until … the accused is 'brought to trial and punishment' or is acquitted."  (*Tideman*, *supra*, at p. 579.)  Accordingly, the case of *People v. Chavez* (2018) 4 Cal.5th 771 notes trial is "the penultimate step in a criminal action," and the final step is "punishment."  (*Id*. at p. 785, citing § 683.)  Based on these principles, we conclude the prosecution phase ends with the rendition of judgment and sentencing.

Pursuant to the Legislature's own terminology, pretrial diversion is literally and functionally impossible once a defendant has been tried, found guilty, and sentenced. Upon reaching this point of "adjudication," the "prosecution" is over and there is nothing

left to postpone.  (§ 1001.36, subd. (c).)  We see this as a clear indication the Legislature did not intend for section 1001.36 to be applied retroactively in cases such as this one.

The above considerations are disregarded in *Frahs*.  Analogizing to the Proposition 57 paradigm, *Frahs* argues "the fact that a juvenile transfer hearing under Proposition 57 ordinarily occurs prior to the attachment of jeopardy, did not prevent the Supreme Court in *Lara*, [citation], from finding that such a hearing must be made available to all defendants whose convictions are not yet final on appeal."  (*Frahs*, *supra*, 27 Cal.App.5th at p. 791 (review granted).)  The argument alludes to Welfare and Institutions Code section 707, subdivision (a)(1), which requires district attorneys to file a transfer motion in juvenile court "prior to the attachment of jeopardy" in order to prosecute a minor as an adult.  However, *Lara* contains no discussion of this procedural requirement, save passing reference to its historical existence.  (*Lara*, *supra*, 4 Cal.5th at p. 305.)

Relevant to *Lara*, the potential benefit of Proposition 57 was elimination of the direct filing procedure in former subdivision (d) of Welfare and Institutions Code section 707, and, by extension, the possibility of avoiding criminal punishment.  The pending cases of defendants who had been prosecuted under the former law all began in criminal court, not juvenile court.  "[U]nder Proposition 57, the juvenile is initially treated as a juvenile and can be treated as an adult only if and when a court transfers the matter to adult court."  (*Lara*, *supra*, 4 Cal.5th at p. 314.)  Retroactive application of Proposition 57 meant those defendants' cases would be sent to juvenile courts, and *Lara* cited with approval a remedial procedure allowing for the defendants' criminal convictions to be treated as juvenile adjudications.  (*Lara*, *supra*, at pp. 310, 313.)  This avoided any implication of the constitutional bar against double jeopardy, which is likely why there is no mention of it in *Lara*.

Furthermore, the timing requirement in Welfare and Institutions Code section 707, subdivision (a)(1), did not facially preclude retroactive application of Proposition 57.  It

23.

only presented a theoretical obstacle for prosecutors in terms of getting cases previously filed under the old law transferred from juvenile court back into criminal court. (*People v. Cervantes* (2017) 9 Cal.App.5th 569, 607, review granted May 17, 2017, S241323, review dismissed, cause transferred Feb. 28, 2018 (*Cervantes*).) The appellate panel in *Cervantes* concluded "the voters would not have wanted a construction of Proposition 57 that would leave the district attorney hamstrung by a claim the motion was untimely" (*ibid.*), and the *Lara* court impliedly agreed. Under the remedial procedure described in *Cervantes*, defendants are understood to "implicitly waive[] any right to object to a transfer motion" in exchange for the potential benefits of Proposition 57. (*Cervantes*, *supra*, at p. 609.) The California Supreme Court referenced the *Cervantes* remedy with approval in *Lara*, *supra*, 4 Cal.5th at page 313. Thus, upon close examination, we view the *Frahs* analogy to Proposition 57 as inapt.

Section 1001.36 does offer the possibility of avoiding a criminal record, but the Legislature used preadjudicative language to describe these benefits. If a defendant successfully completes the diversion program, the trial court "shall dismiss the defendant's criminal *charges* that were the subject of the criminal proceedings at the time of the initial diversion." (*Id*., subd. (e), italics added.) The remaining benefit is what we have referred to as expungement: "[I]f the court dismisses the charges, the *arrest* upon which the diversion was based shall be deemed never to have occurred, and the court shall order access to the *record of the arrest* restricted in accordance with Section 1001.9 [the expungement provisions of a separate misdemeanor diversion program], except as specified in subdivisions (g) and (h) [setting forth additional limitations]." (*Ibid*., italics added.)

For defendants like Craine, retroactive application of the dismissal and expungement provisions of section 1001.36 would closely resemble a grant of felony probation under section 1203.4. The latter statute offers the same type of benefits to defendants who have been adjudicated of a crime but later fulfill specified terms of

probation. Upon a request following the defendant's successful completion of probation, "the trial court shall set aside the verdict of guilty … and … shall thereupon dismiss the accusations or information against the defendant and … he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted .…" (*Id.*, subd. (a)(1).) However, "[t]he limitations on this relief are numerous and substantial, including other statutes declaring that an order under section 1203.4 is ineffectual to avoid specified consequences of a prior conviction." (*People v. Frawley* (2000) 82 Cal.App.4th 784, 791 [citing examples].) Notably, a dismissal and expungement do not affect the prohibition against owning a firearm and the requirement to register as a sex offender under section 290. (§§ 290.007, 1203.4, subd. (a)(2).)

Section 1001.36 does not contain the more extensive limitations on relief found in section 1203.4, which makes sense if the law applies only to nonadjudicated criminal charges. To construe section 1001.36 as having retroactive application would create a troubling loophole: defendants like Craine, who have been convicted, found ineligible or unsuitable for probation, and ordered to register as a sex offender for violating section 314, could obtain greater expungement benefits than are available to probationers convicted of the same offense. Such an occurrence might be relatively uncommon, but with regard to other limitations such as gun ownership, the disparate treatment would be widespread. Successful felony probationers are prohibited from owning or possessing firearms, but no such restriction would apply to mentally ill defendants whose convictions were expunged via retroactive application of the diversion statute. We do not believe this is what the Legislature intended in providing for pretrial diversion, and we find no indication otherwise.

The statute's textual indications are consistent with the available legislative history. Prior to the enactment of Assembly Bill 1810, the Legislature envisioned a "mental health diversion program with a focus on reducing the number of Incompetent to

Stand [Trial] referrals to the Department of State Hospitals." (Assem. Floor, Bill Analysis of Assembly Bill 1810 as amended June 12, 2018 (June 18, 2018, item 17, p. 7).) Since an express or implied finding of competence to stand trial precedes trial, conviction, and sentencing, retroactive intent is a doubtful proposition.

The materials related to Senate Bill No. 215 (2017-2018 Reg. Sess.), which amended the original version of section 1001.36, are especially illuminating. According to the bill's author, the statute was designed to remedy problems associated with the inability of trial courts to "order mental health treatment, relevant counselling, or adherence to a medication regime unless the [defendant] was first convicted, and then placed on probation or sent to jail at county expense." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 215 as amended Aug. 23, 2018, p. 2.) The comments continue: "The predictable results of California's reliance on this outdated method are higher costs for taxpayers, who are forced to pay for the continuous warehousing of the mentally ill, when early, court-assisted interventions are far more likely to lead to longer, cheaper, more stable solutions for the community, and for the person suffering from mental illness. [¶] … By granting courts the ability to divert those suffering from mental illness into treatment *at an early stage in the proceedings*, [Assembly Bill] 1810 seeks to reduce recidivism rates for mentally ill defendants, *and to avoid unnecessary and unproductive costs of trial and incarceration*." (*Id*. at pp. 2–3, italics added.)

The quoted statements convince us that retroactive application of section 1001.36 is antithetical to the Legislature's goals. Early intervention cannot be achieved after a defendant is tried, convicted, and sentenced. The costs of trial and incarceration have already been incurred. Moreover, because mental health diversion is generally only available for less serious offenses, the reality is many defendants would already be eligible for parole or some other form of supervised release by the time their cases were remanded for further proceedings. Since mental health services are already available to

26.

parolees (see, e.g., §3073), it is hard to imagine the Legislature intended for additional court resources and public funds to be expended on "pretrial diversion" assessments at such a late juncture.[5]

According to recent statistics, the median duration of a criminal appeal (statewide, from filing of the notice to filing of the opinion) is 463 days. (Judicial Council of Cal., 2018 Court Statistics Report, Statewide Caseload Trends, 2007-2008 Through 2016-2017, p. 51.) Ninety percent of criminal appeals are processed within an average of 834 days. (*Ibid*.) Section 1001.36, in contrast, says "[t]he period during which criminal proceedings against the defendant may be diverted shall be no longer than two years." (*Id*., subd. (c)(3).) Given the Legislature's apparent desire to have mental health diversion cases resolved in an expedient manner, there is little chance it expected the proceedings described in the statute to occur several years after the date of "adjudication."[6]

In conclusion, the legislative intent behind section 1001.36 is clear from the text of the statute and confirmed by the legislative history. "It would be impertinent for this court to place a strained interpretation upon [the] statute merely to bring about a result which, in the enactment of that statute, was neither contemplated nor intended." (*People v. Borja* (1980) 110 Cal.App.3d 378, 382.) Pursuant to the foregoing analysis, we hold

---

[5] The facts of this case illustrate our point. Craine was sentenced on July 25, 2016, to an aggregate prison term of seven years, with presentence custody credits of 241 days. We do not know his exact circumstances at this point, but a similarly situated defendant who accrued half-time credits while serving his or her sentence would presumably be eligible for parole or postrelease community supervision before their case was resolved on appeal.

[6] We also note the statute's requirement of a "recent diagnosis" by a qualified expert to aid in the determination of whether "the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subds. (b)(1)(A), (B).) There is no reason to believe the Legislature intended to disregard the practical challenges of retroactively diagnosing a person's mental health. "Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." (*Edwards*, *supra*, 554 U.S. at p. 175.)

27.

section 1001.36 does not apply retroactively to defendants whose cases have progressed beyond trial, adjudication of guilt, and sentencing.  We express no opinion on questions of retroactivity under other circumstances.

## DISPOSITION

The judgment is affirmed.


_____

MEEHAN, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

PEÑA, J.